IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ANNABELLA M. & CASTIEL B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ANNABELLA M. AND CASTIEL B.,

CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

CHRISTINA B., APPELLANT, HERBERT M., APPELLEE AND CROSS-APPELLANT, AND ROBERT B.,
APPELLEE AND CROSS-APPELLANT.


Filed June 30, 2026.    No. A-25-238.


Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed in part, and in part dismissed.

Janine F. Ucchino for appellant.

Daniel Gubler, Deputy Douglas County Attorney, for appellee State of Nebraska.

Brian S. Munnelly for appellee and cross-appellant Herbert M.

Kory L. Quandt, of Bressman, Hoffman, Jacobs & Quandt, for appellee and cross-appellant Robert B.

Jennifer L. Konop, guardian ad litem.


MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

- 1 -

## I. INTRODUCTION

Christina B. appeals the order of the separate juvenile court of Douglas County, terminating her parental rights to her two children, Annabella M. and Castiel B. Herbert M. cross-appeals, challenging the order of the juvenile court terminating his parental rights to Annabella. Robert B., the maternal grandfather of the two children, also cross-appeals, challenging the denial of his motion for visitation and/or placement of the children. Upon our de novo review, we affirm the termination of Christina's parental rights and dismiss Herbert's and Robert's cross-appeals.

## II. BACKGROUND

### 1. Procedural History

Christina is the natural mother of Annabella, born in 2012, and Castiel, born in 2016. Herbert is the natural father of Annabella. At the outset, we note that Herbert passed away on January 15, 2026. Because his appeal abated on his death, as further explained later in this opinion, our discussion of Herbert is limited.

On February 4, 2022, the State filed a petition alleging Annabella and Castiel came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024). The petition alleged that the children lacked proper parental care by reason of the fault or habits of Christina in that: Christina had engaged in domestic violence in their presence; Cristina had reason to know her boyfriend, Jason Fisher, was sexually abusing one of the minor children and she allowed Fisher to continue to live in the home with her children; Christina failed to take appropriate action to protect the minor children from sexual abuse; Christina had reason to know Fisher's child was demonstrating sexually reactive behaviors and she continued to allow that child to be alone with her children; Christina failed to provide proper parental care, support, and/or supervision; and all of these allegations placed Annabella and Castiel at risk of harm. The children were removed from the home on February 4, 2022.

On February 11, 2022, the State filed a supplemental petition alleging Annabella came within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of Herbert.

On June 8, 2022, Annabella was adjudicated as a child within the meaning of § 43-247(3)(a) through no fault of Herbert, based on Herbert's plea of admission to an amended supplemental petition. On July 18, Annabella and Castiel were adjudicated as children within the meaning of § 43-247(3)(a), insofar as Christina was concerned. Following the adjudications, the juvenile court held regular review and dispositional hearings and various plans of rehabilitation were implemented.

On January 31, 2024, the State filed a motion for termination of parental rights as to Christina, alleging that Annabella and Castiel came within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State also filed a second motion for termination of parental rights as to Herbert, alleging that Annabella came within the meaning of § 43-292(2), (6), and (7). Both motions alleged it was in the best interests of Annabella and Castiel to terminate the parental rights of each party to his or her respective child/children.

## 2. TERMINATION HEARING

Trial on the motions for termination of parental rights was held on multiple dates between June and December 2024.

Linda Degner had been Christina's therapist since August 2023. Degner testified that Christina had been physically abused by her boyfriend, Fisher. Christina had difficulty understanding how domestic violence affected her children. Degner was concerned that if Christina could not recognize the risk, she would not know what situations were dangerous for her children. Degner stated that Christina needed to be able to recognize the severity of domestic abuse and the risks of future victimization for both her and her children.

Degner testified that Annabella had been sexually abused by Fisher, and Castiel disclosed he had been sexually abused by Fisher's son, Matthew. Degner testified that Christina had not accepted the truthfulness of the children's disclosures. Degner stated Christina needed to be able to support and validate her children's disclosures. Her failure to believe the children showed a lack of support of the children and support for the abuser. Degner testified that when a parent does not believe a child's report of abuse it affects the relationship between a parent and child because the parent becomes someone the child cannot rely on for help or protection. It also minimizes the valuable and vulnerable information the child will share with the parent, which disconnects the trust between a child and parent.

Degner did not believe at the time of trial that Christina could safely parent Annabella and Castiel. She stated there was more work to be done before Christina could demonstrate that she had a strong understanding of what her children need, the impact of past trauma on them, and how to avoid revictimization. Another area of concern was that Christina did not have an appropriate understanding of things that make the children feel unsafe.

Degner stated that further progress would not happen quickly. Christina's cognitive ability was a barrier to her progress in therapy. It impacted her learning ability and capacity, her ability to implement what she was learning, and the speed at which she learned. Ultimately, Degner testified that Christina would not be able to safely parent her children in the near future. Degner had no doubt that Christina loves her children and wants to be a good mother to them. There was a loving and affectionate relationship between Christina and the children.

Mary Ellen Christ-Anderson had been the children's therapist since February 2023. She testified that both children have made progress toward their therapy goals but there had also been setbacks during their time working with her.

She testified that both children have been diagnosed with post-traumatic stress disorder (PTSD). Christ-Anderson testified she also observed underlying signs of depression and anxiety, which can be encompassed in a diagnosis of PTSD. Annabella's symptoms of depression and anxiety included social withdrawal, flat affect, sleep disturbances, and a lack of happiness or excitement in certain situations. Annabella's symptoms of PTSD were sleep disturbances, night terrors, avoidance of relationships due to a fear of getting hurt, protectiveness of certain family members, sensitivity to arguments and conflict, and wanting to solve problems quickly.

Castiel's PTSD symptoms included night terrors, sleep disturbances, and seeing shadows. Castiel was also diagnosed with attention hyperactive disorder and was on medication. Castiel also showed signs of depression and anxiety through flat affect and withdrawal from situations.

Christ-Anderson testified that Castiel does not want to be alone in the bathroom or in his bedroom, and he needs lights turned on at night. Castiel disclosed that there had been times when he was struggling with a problem and he wanted to die. There had also been times that Castiel thought he should kill himself.

Annabella told Christ-Anderson that Fisher lived with the family and sometimes his son Matthew would also stay with them. Annabella told Christ-Anderson that Fisher had a temper, would yell and curse, and would throw things. He would also hit Christina and on one occasion Annabella watched Fisher hold a gun to Christina. Fisher also spanked Annabella's bare bottom with both his hand and a belt. The physical abuse and domestic violence by Fisher occurred everywhere the family lived, including Nebraska, South Dakota, and Arkansas. Annabella told Christ-Anderson she was terrified in her home and worried for her own safety as well as Castiel's and her mother's safety. She felt the need to try and protect her mother.

After several months of therapy with Christ-Anderson, Annabella also disclosed that Fisher had sexual abused her. She told Christ-Anderosn that Fisher locked the bathroom door and gave her a shower. After the shower he laid her face down on the floor and performed anal sex on her. Annabella disclosed this happened when the family lived in Arkansas and occurred more than once. Annabella told Christ-Anderson that she told Christina what Fisher had done but she did not think Christina believed her. Christ-Anderson testified that this experience affected Annabella's ability to trust adults.

Annabella also told Christ-Anderson about incidents that occurred when Fisher's son, Matthew, was in the home and the resulting trauma. Annabella believed Matthew hit the family dog, causing its eye to bleed. Matthew blamed Castiel for hurting the dog, and as a result, Fisher spanked Castiel. Annabella also believed Matthew killed her two guinea pigs. She said Matthew had a temper, was mean, and she did not trust him.

Castiel also told Christ-Anderson that Matthew had injured their dog and killed Annabella's guinea pigs. Castiel also disclosed that Matthew had put his finger in Castiel's rectum but could not recall when this happened.

Christ-Anderson testified that Castiel told her Fisher was mean, yelled a lot, and threw things. Castiel disclosed that he had observed Fisher push and punch his mother and hold a gun to her head. Castiel, who was 5 years old when he was removed from the home, felt it was his job to protect his mother and felt horrible when he could not protect her. Christ-Anderson believed the domestic violence Castiel observed caused him to have a lot of anger issues and to react impulsively. It also affected his ability to trust adults.

Christ-Anderson testified about concerns that arose when Christina started having unsupervised visits around February/March 2023. The children reported that Christina and their grandfather told them not to tell Christ-Anderson family secrets because it could get their mother in trouble. Christ-Anderson stated this caused the children stress because they had been comfortable making disclosures to her and then were being told not to disclose information. Annabella became so upset that she told Christ-Anderson she did not want to have visits with her mother or grandfather. Christina also told the children during the unsupervised visits that she missed Fisher and could not wait to see him again.

Also during the period of unsupervised visits, the foster parents informed Christ-Anderson that Castiel was acting out with more anger and had irritable episodes after visits. Annabella was

more withdrawn, clingy, and seemed more depressed after visits. Both children had more sleep disturbances during the time they were having unsupervised visits with Christina. In the summer 2023, visits were changed back to supervised visits.

Christ-Anderson spoke with Christina in June 2023 to gather information from her about her children. Christina told her the children lied a lot, the allegations that Fisher was abusive were not true, and she did not understand why her children were taken away. Christ-Anderson found her level of denial very concerning.

In December 2023, Annabella told Christ-Anderson that during a supervised visit her mother quietly asked her if "what happened in Arkansas" was true. Annabella was upset by her mother's question.

Christ-Anderson testified that in January 2024, she spoke with Christina a second time. When Christ-Anderson attempted to speak with Christina about Fisher, she deflected the conversation and spoke about Matthew. Christina minimized what she and the children had experienced with Fisher. She acknowledged a couple violent incidents, but based on what the children disclosed, Christ-Anderson believed the abuse was more prevalent than Christina acknowledged.

At a family therapy session in May 2024, Christina shared that she had told Annabella at a visit that she should stay with her foster parents and that they were good people. Annabella shared, in turn, how upsetting that was to her because she desperately wanted to go home. At the same session, Castiel expressed that he did not want to go home if Fisher was there. Christ-Anderson testified that Annabella had regressed and been more withdrawn in therapy because of such statements by Christina during visits. Annabella had stopped talking about traumatic events because she thought if she made disclosures she would never go home.

Christ-Anderson testified that in her opinion it was in the children's best interests to terminate Christina's parental rights. Her opinion was based on Christina's limited progress and the uncertainty of how long it would take, if ever, for her to be ready to protect the children and for them to go home. She testified that the children had been under stress about the uncertainty of their future and it was not fair to make them continue to wait for an unspecified amount of time.

Vanessa Cruz supervised visits between Christina and the children from August 2023 to April 2024. The safety plan for the visits required that two visitation workers be present for each visit and visits were not allowed to take place in Christina's home. There were also specific topics that Christina was not to discuss with the children. Cruz testified that Christina was very consistent with visits.

Cruz testified that during most visits Castiel would not listen to Christina and would do the opposite of what she told him. She would try to redirect him but typically his behavior would not change, so she would ignore him and tell the visitation workers to do the same. There were multiple visits that ended early due to Castiel not listening to Christina, and/or due to Castiel nearly getting hurt.

During a visit in December 2023, Cruz saw Christina whisper something to Annabella. On the ride back to the foster home after the visit, Cruz asked Annabella what Christina whispered to her and Annabella said it was a secret. Cruz told Annabella there should not be any secrets. Annabella then stated that Christina asked her if what she reported happening when they lived in Arkansas was true. The caseworker at the time also testified that Annabella told her Christina asked

if what she claimed to have happened in Arkansas was true, which the caseworker understood to mean the sexual abuse by Fisher.

Philip Human and his wife had been the children's foster parents since August 2023. Human testified that Annabella was doing well overall in his home and did not have a lot of bad behavior but struggled with how to interact with her peers and it had been difficult for her to make friends. She also struggled with anxiety, especially at night, and still needed to sleep with her bedroom door open.

Human testified that Castiel struggled to feel safe but had shown great improvement; specifically, he was seeing shadows less often and the frequency of night terrors had decreased. He no longer asked Human or his wife to stand outside his bedroom door when he is changing clothes as he did in the past. Castiel continued to struggle with anxiety.

Human described a time in January 2024 where Christina gave the children several bags of clothes to take back to the foster home. The children became upset when they identified that some of the clothes came from Matthew. For several months after that, Castiel regressed back to wanting one of the foster parents to stand outside his door when he was changing and outside the bathroom door when he was going to the bathroom. The frequency of his night terrors also increased for a period.

Diamond Hannon Lewis was the caseworker for the family from October 2023 to June 2024. Lewis testified that Christina began having unsupervised visits in April 2023, but in July 2023, unsupervised visits were stopped and visitation was suspended for a month. The visits were suspended due to Annabella and Castiel making new disclosures about sexual abuse. There were also concerns arising when the children had visits with their grandfather.

Lewis testified that when Christina's visits with the children resumed, there was a safety plan put in place. The visits returned to being supervised and two visitation workers were to always be present. Christina was not to discuss details about the case or discuss Fisher in front of the children, and she was not to have private conversations with the children.

According to Lewis, there were ongoing concerns about Christina allowing Fisher to remain in her life. Lewis testified that when she took over the case in October 2023, the previous caseworker told her Christina had continued living with Fisher and Fisher was providing her financial support. Christina had denied that she was living with Fisher for some time, but in June or July 2023, she admitted she was still living with him and he was paying the rent.

Lewis testified that when she took over the case there was still concern Fisher was providing Christina with financial support based on conversations with Christina, as well as her limited income. Christina had moved into a different house and was living with a friend, Shane Profundy, who she claimed was paying half of the bills. In November 2023, the Department of Health and Human Services (DHHS) received an intake alleging that Fisher was also living in Christina's home. As part of investigating the intake report, Lewis asked Christina for a copy of her lease at least six times. Each time Lewis asked about the lease, Christina claimed she did not have a copy and said she would try to get one. Christina has never provided Lewis with a copy of the lease, leading Lewis to believe Christina was trying to hide who was listed on the lease. Lewis also spoke with Profundy in November 2023, and he indicated Fisher was living in the home and was on the lease.

In December 2023, Lewis conducted a walkthrough of Christina's home and observed several items signaling Fisher was living at the home. Lewis observed a significant number of tools in the garage, one with Fisher's name on it, as well as Fisher's vehicle in the garage. Christina told Lewis that Fisher gave his car and tools to Profundy. There were tools on the dresser and men's deodorant in Christina's bedroom, as well as men's clothes and shoes in her closet, which Christina was initially hesitant to open. She told Lewis the tools and the deodorant were hers and the men's clothes and shoes belonged to Profundy. In the bathroom, Lewis observed more than one toothbrush and men's shower gel inside the shower.

Christina told Lewis that Profundy's bedroom was in the basement and she was the only one who slept in her bedroom. Christina did not allow Lewis to see the basement. Lewis also testified that based on Christina's limited financial resources, the amount of furniture in the residence seemed out of the ordinary. After the home visit, Lewis believed Fisher was living in the home. Lewis testified she had since done additional walk-throughs of Christina's home and the concerns she had in December 2023 were not present.

Lewis testified she had discussed Annabella's sexual abuse disclosure with Christina and Christina indicated she did not know what to believe and wanted to "get the truth." Lewis testified that Christina does not understand the threat Fisher posed to her and her children. She further stated that Christina's lack of understanding is a continued barrier to reunification because Christina cannot be a protective parent. In April 2024, Lewis received an email from Christina stating that her children were removed under false pretenses and DHHS was brainwashing her children. Lewis testified the email indicates that after more than 2 years, Christina still did not understand why her children were not in her care.

Lewis testified that Christina had not yet accomplished the goals set for individual therapy because she had not shown she can protect the children from harm and had not held herself accountable for that failure in the past. Lewis did not believe Christina had successfully addressed the issues that were the reason for the children's removal because she had not demonstrated she understands why it is important to be able to protect the children and she was still oblivious as to why the children were in foster care. Lewis believed if the children were returned home, they would not be safe. Lewis stated that based on continued concerns and barriers to case progression, Christina was not a fit parent. She also testified it was in the children's best interests to terminate Christina's parental rights because after 2½ years, she could not confidently say Christina did not have a relationship with Fisher and that she could be a protective parent. In Lewis' opinion, even if Fisher was not in Christina's life, she was easily manipulated and, therefore, there was a possibility of another perpetrator coming into her life. And because she lacked insight as to why her children were removed and lacked accountability and acknowledgement of their abuse, she did not have the skills necessary to protect her children.

Following trial, the court entered an order terminating Christina's parental rights to her children. The court found that the children were within the meaning of § 43-292(6) and (7) by clear and convincing evidence and that it was in their best interests to terminate Christina's parental rights. The court entered a separate order terminating Herbert's parental rights to Annabella, finding she was within the meaning of § 43-292(6) and (7) by clear and convincing evidence and that it was in her best interests to terminate Herbert's parental rights.

## 3. ROBERT'S CROSS-APPEAL

Robert is Christina's father and Annabella and Castiel's grandfather. Prior to the motions for termination of parental rights being filed, Robert filed a complaint to intervene in the juvenile proceedings, which the court allowed. On February 27, 2024, Robert filed a motion for placement and/or visitation, asking the court to grant him placement and custody of Annabella and Castiel, or, in the alternative, visitation with the children. On June 17, the court denied Robert's request for placement and custody and for unsupervised visitation but reserved its ruling on supervised or therapeutic visitation. On March 13, 2025, the court denied Robert's request for supervised visitation and allowed one family therapy session between Robert and the children.

## III. ASSIGNMENTS OF ERROR

Christina assigns, renumbered, that the juvenile court erred in (1) admitting impermissible hearsay evidence, (2) finding that the State proved by clear and convincing evidence that her parental rights should be terminated pursuant to § 43-292(6) and (7), and (3) finding that terminating her parental rights was in the children's best interests.

On cross-appeal, Herbert assigns, restated, that the juvenile court erred in finding that the State proved by clear and convincing evidence that his parental rights should be terminated pursuant to § 43-292(6).

On cross-appeal, Robert assigns that the juvenile court erred in (1) denying his motion for visitation and (2) denying his motion for placement of the children.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. TERMINATION OF CHRISTINA'S PARENTAL RIGHTS

#### (a) Admission of Hearsay Evidence

Christina first assigns that the juvenile court erred in admitting hearsay evidence during the termination hearing despite her objections. She claims the court allowed improper out-of-court statements of the children during the testimony of the foster parents, therapists, and caseworkers. Christina sets out specific examples of this alleged hearsay testimony in her appellate brief.

The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *Id.*

Christina acknowledges that the Nebraska Evidence Rules did not apply at the termination hearing but argues that the admission of the out-of-court statements violated her right to due

process. We disagree. Fundamental fair procedures were used throughout the case and we conclude Christina's due process was not violated. This assignment of error fails.

### (b) Statutory Grounds for Termination

Christina next assigns the juvenile court erred in finding that the State proved by clear and convincing evidence that her parental rights should be terminated pursuant to § 43-292(6) and (7). For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

Christina argues that the juvenile court erred in finding that the State proved statutory grounds existed to terminate under § 43-292(6) and (7). We first address whether § 43-292(7) has been met.

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests' step of the analysis. *In re Interest of Becka P. et al., supra*.

Annabella and Castiel were removed from the home in the present case on February 4, 2022. Since the day they were removed, they have never returned to Christina's care and have remained in out-of-home placement. At the time the State filed the motion for termination of parental rights on January 31, 2024, Annabella and Castiel had been placed outside the home for over 23 continuous months. Therefore, the children had been out of the home for more than 15 of the most recent 22 months; the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.* Because we find that the State presented clear and convincing evidence that a statutory ground to terminate existed under § 43-292(7), we need not address the other statutory ground.

### (c) Best Interests

Christina next assigns that the juvenile court erred in finding that terminating her parental rights was in the children's best interests. Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship

between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

The children were removed from Christina's home, in part, because they had been exposed to domestic violence against their mother by Fisher. At the time of the termination hearing, Christina failed to understand how the children's exposure to domestic violence negatively impacted them. She also failed to recognize the risk domestic violence presents, or, stated differently, she was unable to recognize what situations are dangerous for her children.

The children were also removed because Christine failed to protect them from sexual abuse by Fisher and his son, Matthew. At the time of the termination hearing, Christina still did not believe the children had been sexually abused. Degner, Christina's therapist, testified that her failure to believe the children showed a lack of support of the children and support for the abuser. Degner testified that when a parent does not believe a child's report of abuse, the parent becomes someone the child cannot rely on for help or protection. It also affects a child's ability to trust adults.

Despite Fisher being the perpetrator of the domestic abuse and sexual abuse to Annabella, Christina continued to live with him until at least December 2023, 10 months after the children were removed and the case was pending. Christina tried to hide this from two different caseworkers, eventually admitting it to one of them.

The children's mental health has been negatively impacted by the trauma they experienced in their mother's care and the resulting time in foster care. The children suffer from PTSD, have experienced nightmares and/or night terrors, and have feelings of being unsafe. The children's therapist, Christ-Anderson, testified that the children had made progress in therapy, but there had been setbacks at times. At the time of the termination hearing, the children were still working toward their treatment goals.

Christina has not demonstrated that she can protect the children from harm, and she had not held herself accountable for that failure in the past. She is either unable or unwilling to understand the threat Fisher posed to herself and the children. As a result, she cannot keep the children safe. Degner did not believe Christina would be able to safely parent the children in the near future. She also testified that Christina's cognitive abilities were a barrier to progress. Lewis, her caseworker, believed that Christina's lack of understanding of the threat Fisher posed to her and her children was a continued barrier to reunification because Christina cannot be a protective parent. There is no timeline as to when, if ever, Christina will understand the effects of the trauma experienced by the children while in her care and acquire the skills necessary to support their healing and treatment and protect them from future harm.

Christ-Anderson opined that it was in the children's best interests for Christina's parental rights to be terminated based upon her limited progress and the uncertainty of how long it would take for her to be ready to protect the children and for them to go home. She testified that the children had been under stress about the uncertainty of their future and it was not fair to make them continue to wait for an unspecified amount of time.

Lewis stated that based on continued concerns and barriers to case progression, Christina was not a fit parent. She also testified it was in the children's best interests to terminate Christina's parental rights because after more than 2 years, she could not confidently say Christina did not still have a relationship with Fisher and that she could be a protective parent.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Christina has failed to put herself in a position to properly parent Annabella and Castiel. It does not appear Christina will become a fit and capable parent any time soon. The children need and deserve stability and security in their lives. They should not be suspended in foster care when their mother is unable or unwilling to rehabilitate herself. Accordingly, based on our review of the evidence, we agree with the juvenile court that Christina was unfit and that terminating her parental rights was in the children's best interests.

## 2. HERBERT'S CROSS-APPEAL

As noted earlier, Herbert has died. At the time of the termination hearing, he had multiple health conditions, and he subsequently passed away on January 15, 2026. The statutory provisions regarding abatement and revivor of actions apply to cases in which a party dies pending an appeal. *In re Conservatorship of Franke*, 292 Neb. 912, 875 N.W.2d 408 (2016). Whether a party's death abates an appeal or cause of action presents a question of law. *Id.*

A party's death has an immediate impact on the court's jurisdiction because a deceased person cannot maintain a right of action against another or defend a legal interest in an action or proceeding. See *Muller v. Weeder*, 313 Neb 639, 986 N.W.2d 38 (2023).

Generally, when a party dies during the pendency of an action, the jurisdictional consequences depend on whether the action is one which abates or survives upon death. If the pending action is the type which abates upon the death of a party, then the abatement is absolute and the action ceases to exist. *Id.* When absolute abatement occurs while an action is pending on appeal, the correct procedure for the court to follow generally depends upon the nature of the action. *Id.*

Neb. Rev. Stat. §§ 25-1401 and 25-1402 (Reissue 2016) set forth actions that abate from the death of a party and others that survive the death of a party and may be revived. However, the Nebraska Supreme Court has long held that the language of these statutes should not be understood to suggest that all pending actions other than those specifically listed in the statutes survive the death of a party, because Nebraska case law has limited the list of those actions which survive death to exclude those which involve purely personal rights. See *id.*

Herbert was appealing the termination of his parental rights. This action involved a right that was purely personal to him and did not survive his death. Accordingly, the appeal abated on Herbert's death, and there is no longer a party with an interest in the resolution of this appeal. See, *Bullock v. J.B.*, 272 Neb. 738, 725 N.W.2d 401 (2006) (paternity action was personal and did not survive death of putative father); *Williams v. Williams*, 146 Neb. 383, 19 N.W.2d 630 (1945) (divorce action did not survive death of party to marriage because of personal nature of divorce action). Accordingly, Herbert's appeal is dismissed.

- 11 -

Also, upon Herbert's death, his attorney lacked standing to seek any relief on Herbert's behalf. Although an attorney of a deceased client may have a duty to protect the client's interests by alerting a legal representative of his or her pending claim, absent a contractual agreement to the contrary, an attorney's representation of a client generally ends upon the death of that client. See *In re Conservatorship of Franke*, 292 Neb. 912, 875 N.W.2d 408 (2016). Herbert's attorney filed a replacement brief on Herbert's behalf on January 29, 2026. Herbert had died on January 15, 2026. The attorney's representation of Herbert ended when Herbert died, and his attorney lacked standing to file the replacement brief. An attorney's unauthorized actions on the part of a deceased client are a nullity. *Id.* Accordingly, we strike the replacement brief filed by Herbert's counsel on January 29, 2026.

### 3. ROBERT'S CROSS-APPEAL

Robert assigns on cross-appeal that the juvenile court erred in denying his motion to have the children placed with him and in denying his motion for visitation with the children.

As previously stated, Robert is Annabella and Castiel's maternal grandfather and the court allowed him to intervene in the juvenile proceedings. Grandparents have a direct legal interest in juvenile dependency proceedings involving their biological or adopted grandchildren which entitles them to intervene as a matter of right in such proceedings prior to final disposition. *In re Interest of Kayle C. & Kylee C.*, 253 Neb. 685, 574 N.W.2d 473 (1998). However, the rights of grandparents are altered once parental rights of a child have been terminated.

If a dependency proceeding is finally resolved by a termination of parental rights pursuant to § 43-292, the relationship between grandparent and grandchild is also terminated. *In re Interest of Kayle C. & Kylee C., supra.*

Because we have affirmed the termination of Christina's parental rights, Robert's relationship with Annabella and Castiel is also terminated. Any interest or right to visitation or placement Robert had by virtue of his biological relationship to the children ceased to exist when the parental rights of his daughter, Christina, were terminated.

In addition, the right of appeal in a juvenile case in Nebraska is purely statutory. See *In re Interest of Joseph C.*, 299 Neb. 848, 910 N.W.2d 773 (2018). Neb. Rev. Stat. § 43-2,106.01 (Reissue 2016) controls who has the right to appeal from a juvenile court's order. The statute provides that any final order or judgment entered by a juvenile court may be appealed by (a) the juvenile; (b) the guardian ad litem; (c) the juvenile's parent, custodian, or guardian; or (d) the county attorney or petitioner. Robert, as the children's grandparent, is not included in any of these categories. Grandparents do not have a statutory right to appeal from a juvenile court order. See *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016).

Robert acknowledged his inability to appeal based on § 43-2,106.01. He contends, however, that § 43-2,106.01 contradicts Neb. Rev. Stat. § 25-1902 (Reissue 2022), which allows appeals from an order affecting a substantial right made during a special proceeding. To the extent there is a conflict between two statutes on the same subject, the specific statute controls over the general. *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018). Section 43-2,106.01 is more specific and is applicable here.

Accordingly, Robert has no standing to cross-appeal and his cross-appeal is dismissed.

## VI. CONCLUSION

We conclude the juvenile court did not err in terminating Christina's parental rights to Annabella and Castiel. The juvenile court's order is affirmed regarding Christina's parental rights.

We further conclude that Herbert's cross-appeal abated upon his death, and that Robert has no standing for his cross-appeal. Accordingly, Herbert's cross-appeal and Robert's cross-appeal are dismissed.

AFFIRMED IN PART, AND IN PART DISMISSED.